UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT EARL BENTLEY, )
                                            )
                        Petitioner, )        Case No. 1:03-cv-648
                                            )
v.                                          )        Honorable Robert Holmes Bell
                                            )
MARY BERGHUIS,                              )
                                            )        **REPORT AND RECOMMENDATION**
                        Respondent. )
_____)

> This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254.  Petitioner was convicted in the Saginaw County Circuit Court of armed robbery, MICH.
COMP. LAWS § 750.529, safe breaking, MICH. COMP. LAWS § 750.531, and possession of a firearm
during the commission of a felony, MICH. COMP. LAWS § 750.227b.  Petitioner was sentenced as a
fourth habitual offender to imprisonment for 25 to 50 years for the armed robbery conviction, 15 to
25 years for the safe-breaking conviction and a two-year term for the felony-firearm conviction, to
be served consecutive to his sentences for the other two offenses.  In his *pro se* petition, Petitioner
raises two grounds for relief, as follows:

> > I.    Petitioner's Sixth Amendment right to the effective assistance of trial counsel
> > was violated when trial counsel: (a) failed to effectively cross-examine
> > witness Danielle Awad, (b) failed to object to prosecutor's failure to exercise
> > due diligence to produce witness Elisa Potter at trial, (c) requested an
> > intoxication instruction that was inconsistent with the defense; and (d) failed
> > to properly investigate and discover the prosecutor's case.

> > II.   Petitioner's Sixth Amendment right to the effective assistance of appellate
> > counsel was violated where counsel failed to identify and raise the claims
> > presented in Petitioner's motion for relief from judgment.

Respondent has filed an answer to the petition (docket #13) stating that Petitioner's claims are procedurally defaulted. Upon review and applying the AEDPA standards, I agree that Petitioner's claims are procedurally defaulted. I further conclude that even if Petitioner's claims of ineffective assistance of trial and appellate counsel were not defaulted, they are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

### A. Trial Court Proceedings

The state prosecution arose from the robbery of the Outback Steakhouse on Tittabawassee Road in Saginaw County on December 6, 1998. Petitioner was charged with armed robbery, safe breaking, and possession of a firearm during the commission of a felony. He was tried before a jury on July 20-23, 1999.

Manager Jason Weigandt and employees Danielle Awad, Katie Blymyer, Elisa Potter and Mike Coster closed the restaurant on the night of the robbery. (Tr II, 117-21.) Weigandt testified that at about 11:30 p.m., two hours after the restaurant closed, he went out the back door to take some garbage to the dumpster. (Tr II, 121.) In accordance with store security policies, Weigandt wore a panic alarm on a string around his neck. (Tr II, 121-22.) As Weigandt opened the door, he was rushed by a man with a gun. (Tr II, 123.) Weigandt testified that the robber was a black male wearing a bandana over his face and a hood. (Tr II, 141, 168.) The robber turned Weigandt around and walked behind him with a gun held to his back. (Tr II, 123.) After Weigandt turned, he started pressing the panic alarm around his neck. (Tr II, 123.) The man asked Weigandt what he had around his neck, and then reached down Weigandt's shirt and took the panic alarm. (Tr II, 123.) When Weigandt and the robber reached the office door, they came into contact with the

other four closing employees.  (Tr II, 123.)  The robber directed them all into the office and ordered

Blymyer, Coster and Potter to lie down on their stomachs.  (Tr II, 124.)  The robber threw a bag on

the desk and ordered Weigandt and Awad to "put all of the money in the bag, (Tr II, 124.)  Weigandt

put the money from the two cash drawers and the petty cash box into the bag.  (Tr II, 125-127.)  He

also opened the main compartment of the safe and emptied it into the bag.  (Tr II, 126.)

   Weigandt informed the robber that he had given him all of the cash.  (Tr II, 129.)  At

that point, the robber noticed the drop box in the upper left-hand corner of the safe.  (Tr II, 129.)

Weigandt explained that the drop box required two keys and that Wolverine had the other key.

(Tr II, 129.)  The robber commented, "We've got all night, we're getting in there."  (Tr II, 130.)  He

ordered Weigandt onto the floor and instructed Awad to try each key in the drop box.  (Tr II, 130,

135.)  When none of the keys fit, the robber asked Awad if they had a crowbar.  (Tr II, 136.)  They

did not have a crowbar, but one of the employees offered that there was a tool box in the cabinet.

(Tr II, 136.)  After he got the tools, the robber ordered Awad to lie down on top of Weigandt.  (Tr II,

136-37.)  Weigandt could hear the man using tools to pound on the safe.  (Tr II, 136-37.)  Jason

believed that the robber was wearing latex gloves from sounds that they were making.  (Tr II, 145.)

According to Weigandt, the gloves seized from Petitioner upon his arrest were not the same color

as those used at the Outback.  (Tr II, 163.)  A few minutes later, another employee offered that there

was also a drill in the cabinet.  (Tr II, 137.)  The robber then ordered Coster to get the drill and start

drilling on the safe.  (Tr II, 137.)

   While the robber was trying to break into the safe, Deon Anderson, another Outback

employee who was waiting in the front of the restaurant for a ride home, started yelling for

Weigandt.  (Tr II, 146.)  Weigandt heard the robber go out the office door.  (Tr II, 147.)  Shortly

thereafter, a police officer came to the office door.  Weigandt estimated that the robbery lasted twenty minutes  and that the robber left with approximately $4,000 in cash.  (Tr II, 141, 151.)

Danielle Awad, Mike Coster and Katy Blymyer gave similar testimony concerning the robbery.  Like Weigandt, none of the other employees could positively identify Petitioner as the robber because the robber was wearing a bandana over his face.  Awad described the robber as a black male wearing a jacket, a hooded sweatshirt and red handkerchief over his face.  (Tr II, 176, 205.)  The robber also was wearing dark-colored latex gloves.  (Tr II, 196.)  Coster testified that the robber was a black male wearing dark clothing, a hood and a red bandana over his face.  (Tr II, 216-17, 232-35.)  Blymyer testified that the robber was a black male wearing a purple hooded sweatshirt and a red bandana over his face.  (Tr II, 246-47.)

Deon Anderson testified that he was in the front of the restaurant waiting for Danielle to give him a ride home, when he saw police officers at the front door of the restaurant.  (Tr III, 353.)  When the officers told him that they were investigating an alarm, Anderson led the officers toward the office to check with Weigandt.  (Tr III, 355.)  Anderson was shouting "Jason" as he walked toward the office.  (Tr III, 363.)  As Anderson turned to look into the office, a man  was coming out holding a gun.  (Tr III, 355.)  The man was wearing a hooded jacket or sweatshirt and black gloves, and had a bandana over his face.  (Tr III, 356, 366.)  Anderson also saw a bag full of money sitting on the floor just outside of the office door.  (Tr III, 357-58.)  The man told Anderson not to move, and then grabbed the bag of money and ran out the back door.  (Tr III, 358-60.)

Tim Patterson, a Saginaw Valley State University (SVSU) police officer, and Daniel Owen, a Carrollton Township police officer, responded to the robbery alarm at the Outback.  (Tr II, 275, 305.)  After the officers walked around the building without incident, they approached the front

- 4 -

door.  (Tr II, 278, 305.)  They looked through the front doors and saw a man sitting in a booth. (Tr II, 278, 306.)  The man, Deon Anderson, came to the door and talked to the officers.  (Tr II, 279.) When the officers explained that they were responding to an alarm, Anderson led them back to the office where Jason was counting the receipts.  (Tr II, 279, 306-307.)  As Anderson reached the office, he encountered the robber.  (Tr II, 281.)  Officer Patterson saw the robber turn Anderson to the side and put his gun in Anderson's abdomen.  (Tr II, 281.)  Patterson drew his weapon on the robber. (Tr II, 282.)  After a few seconds, the robber pushed Anderson toward Officer Patterson and ran out the back door.  (Tr II, 283-85.)  Officer Patterson described the robber as a black male, approximately six feet tall, 165 to 185 pounds, wearing a flannel shirt, a hat or hood and a red bandana over his face.  (Tr II, 283.)  Patterson testified that People's Exhibit No. 15 looked like the blue steel handgun that the robber was holding.  (Tr II, 286.)

Officer Owen ran back out through the front door of the restaurant and saw someone running from the back of the Outback toward Taco Bell.  (Tr II, 310).  Officer Owen, joined by Saginaw County Sheriff Deputy Pfau, gave chase.  (Tr II, 311; Tr III, 379.)  When they got behind Taco Bell, the officers could see the suspect throwing money.  (Tr II, 311; Tr III, 380.)  The suspect threw some money behind Taco Bell and more money and a bag containing money on the street near the corner of Tittabawassee and Town Center.  (Tr II, 289, 314; Tr III, 381.)  The suspect also threw a red bandana as he ran across the lawn of the Four Points Hotel.  (Tr II, 314, 322; Tr III, 381-82.) As the suspect ran around the corner of the hotel, the officers lost sight of him.  (Tr II, 315; Tr III, 383.)  At that point, Sergeant Hinterman of the Saginaw County Sheriff's Department and other officers from Saginaw Township arrived and joined the pursuit.  (Tr III, 383.)  The officers searched sheds and dumpsters behind the hotel.  (Tr III, 385.)  Hinterman discovered Petitioner behind one

of the sheds, lying on the ground under a banquet table. (Tr III, 411.) At the time Petitioner was apprehended, he was wearing a flannel shirt, dark pants and black shoes. (Tr II, 320-21; Tr III, 386, 415.)

Officers William Federspiel and Kevin Coughlin of the Saginaw Township Police Department assisted in apprehending Petitioner. Coughlin placed Petitioner in handcuffs and conducted a search incident to arrest. (Tr III, 448.) During the search, Coughlin seized a set of handcuffs, an alarm on a string, two pairs of black latex gloves, a black cap, a pager and a one-dollar bill. (Tr III, 416-17, 448-50.) Sergeant Hinterman also found a fully loaded .357 Magnum on the ground near the base of the table where Petitioner had been hiding. (Tr III, 412, 424.) All of the officers identified Petitioner as the man apprehended by police at the hotel. (Tr II, 293-94, 319, 387; Tr III, 416, 447.) Steven Jahn, a co-owner of the Outback Steakhouse, testified that he had tested the panic alarm seized from Petitioner and confirmed that it was an Outback alarm. (Tr III, 477-78.) Detective Joel Sheldon of the Saginaw County Sheriff's Department testified that a total of $3,043.44 in cash currency and a few checks were recovered from the area near the Outback restaurant. (Tr III, 488.)

Petitioner called his sister and wife as witnesses. Regina Mack, Petitioner's sister, testified that Petitioner and his wife came to her house in Saginaw for a visit at 9:00 or 9:30 p.m. on November 6, 1998. (Tr III, 506.) Petitioner brought beer with him and drank it at Mack's home. (Tr III, 508.) Petitioner and his wife left just before 11:00 p.m. (Tr III, 510.)

Gwendolyn Bentley, Petitioner's wife, testified that she and Petitioner arrived at Mack's home at about 9:00 p.m. (Tr III, 520.) Bentley testified that Petitioner had been drinking all evening and continued to drink beer during their visit with Mack. (Tr III, 521.) Petitioner left

Mack's house a couple of times to make phone calls. (Tr III, 528.) Bentley believed that he was calling other women. (Tr III, 528.) Bentley and Petitioner left Mack's home around 11:00 p.m. and went to the Taco Bell on Tittabawassee Road. (Tr III, 522.) Bentley was driving. They had an argument in the car about Petitioner calling other women, and Petitioner got out in the Taco Bell parking lot to walk home. (Tr III, 523.) When Petitioner refused to get back in the car, Bentley left. (Tr III, 523.) Petitioner was wearing dark jeans, and a flannel shirt jacket with a dark sweatshirt T-shirt underneath. (Tr III, 524.) Bentley returned a few minutes later and gave him another chance to get in the car. (Tr III, 529.) Petitioner again refused and continued walking toward Tittabawassee Road. (Tr III, 529.) Bentley next heard from Petitioner when he called her from the Saginaw County Jail at 2:30 or 2:40 a.m. (Tr III, 532.)

Petitioner testified in his own defense. He confirmed being present at Mack's house, leaving at around 11:00 p.m. to go to Taco Bell. (Tr III, 542.) Petitioner testified that he had consumed seven cans of beer and was intoxicated. (Tr III, 543.) Petitioner and his wife got into an argument about who Petitioner was calling from Mack's house. Petitioner became angry and got out of the car. (Tr III, 543.) Petitioner admitted that he was chased by police across Tittabawassee Road and that he hid behind the shed behind Four Points Hotel. (Tr III, 548-49.) Petitioner further admitted that officers apprehended him while he was hiding behind the shed. (Tr III, 550.) Petitioner, however, denied that he had a gun or that he robbed the Outback. (Tr III, 544-46.) At the time of his arrest, Petitioner admitted to wearing a flannel shirt, black jeans, and black Rockport shoes. (Tr III, 549.) Petitioner further admitted to being in possession of a black hat, but categorically denied possessing a set of handcuffs, latex gloves or a panic alarm. (Tr III, 550-53.)

Petitioner also denied that he ever possessed a red bandana or a gun.  (Tr III, 552.)  In addition, Petitioner admitted to writing a letter to Deon Anderson, stating:

> Dear Deon, My name is Robert Bentley.  I'm 46 years old.  I'm married with a family and a good job.  Deon, I don't know you, and I'm sure you don't know me, but right now I'm a victim being wrongly accused of the Outback holdup.
>
> That decision [] is your to make.  If you would work with my lawyer with telling him the real, everything will work out for me.  I know as a young, black man, I have your help.  I would rather have you on our team than you on the prosecutor.
>
> Deon, you don't owe me nothing.  But as a black man, put yourself in my shoes.  If you had come to me, [] I wouldn't hesitate to help you.
>
> Thank you for your time, and I hope that in some way my letter interests you to help me and not against me with the prosecutor.

(Tr III, 557-558.)

At the conclusion of trial on July 23, 1999, the jury found Petitioner guilty as charged of armed robbery, safe breaking and felony-firearm.  (Tr. IV, 629.)

## B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  Petitioner raised two claims concerning his sentence that are not at issue in this petition.  By unpublished opinion issued on July 27, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  *See People v. Bentley*, No. 222124 (Mich. Ct. App. July 27, 2001).  Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals.  By order entered February 4, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. *See People v. Bentley*, No. 119961 (Mich. Feb. 4, 2002).

- 8 -

## C. Post-conviction relief

On February 11, 2002, Petitioner filed a motion for relief from judgment raising seven grounds for relief that include the claims presented in the instant habeas corpus petition. The circuit court issued an opinion and order on March 6, 2002, denying Petitioner's motion. The Michigan Court of Appeals and the Michigan Supreme Court both denied Petitioner's applications for leave to appeal for failure to establish entitlement to relief under M.C.R. 6.508(D). *See People v. Bentley*, No. 246460 (Mich. Ct. App. May 15, 2003); *People v. Bentley*, No. 123977 (Mich. Sept. 29, 2003).

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether

the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 540 U.S. 1004 (2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

- 10 -

This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**Discussion**

I.

Respondent contends that Petitioner's claims are procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004), *pet. for cert. filed*, No. 04-8172 (Jan. 7, 2005); *accord Lancaster*, 324 F.3d 423 at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001), *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see also Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

For purposes of procedural default, the Court is concerned with the last "explained" state court judgment. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). Here, the Michigan Supreme Court expressly stated that it denied Petitioner's application for leave to appeal on the basis that Petitioner failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D).[1] "It is well established in this circuit that the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which the Michigan Supreme Court may rely in foreclosing review of federal claims." *Munson v. Kapture*, 384 F.3d 310, 315 (6th Cir. 2004), *pet. for cert. filed*, No. 04-8798 (Feb. 14, 2005); *see also Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002)*; Simpson v. Jones*, 238 F.3d 310, 207-08 (6th Cir. 2000). In a case such as this, where the Michigan Court of Appeals and Michigan Supreme Court relied upon M.C.R. 6.508(D) in denying leave to appeal, it is sufficiently clear that the state supreme court intended to invoke a procedural bar. *See Munson*, 384 F.3d at 314; *Abela v. Martin (Abela II)*, 380 F.3d 915, 922-23 (6th Cir. Aug. 27, 2004); *see also Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004); *Burroughs*, 282 F.3d at 412; *Simpson*, 238 F.3d at 207. Accordingly, Petitioner's grounds for habeas corpus relief are procedurally defaulted.

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485; *Lucas v. O'Dea*, 169

---

[1]Under M.C.R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b).

F.3d 1028, 1033 (6th Cir. 1999); *Rust*, 17 F.3d at 160-61. Petitioner asserts ineffective assistance of appellate counsel as cause for his failure to raise his claims on direct appeal. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted. However, because review of the claim was denied by the Michigan appellate courts pursuant to M.C.R. 6.508(D), the claim also is procedurally defaulted. Nevertheless, Petitioner's claim of ineffective assistance of appellate counsel may serve as cause to excuse a procedural default. *See Munson*, 384 F.3d at 316.

    In order to excuse his default, Petitioner must show that his appellate counsel's failure to raise the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984). *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). Under *Strickland*, the petitioner must prove the following to establish a claim of ineffective assistance of counsel: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *See McFarland*, 456 F.3d at 699 *(*citing *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Thus, in order to decide whether Petitioner can present his claims of ineffective assistance of trial counsel, I must decide whether there is a reasonable probability that

- 13 -

the claims would have prevailed at the time appellate counsel failed to raise them.  *See McFarland*, 356 F.3d at 699.

II.

The two-prong *Strickland* standard also applies to Petitioner's claims of ineffective assistance of trial counsel.  With regard to the first prong, the defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

(A)    Petitioner first claims that counsel was ineffective when he failed to effectively cross-examine prosecutorial witness Danielle Awad concerning her identification of the robber.  Petitioner contends that defense counsel should have cross-examined Awad concerning her previous statements concerning the robber's age.  Awad testified at the preliminary examination, "I

- 14 -

thought he [the robber] was younger then [sic] what he [Petitioner] is actually." (Preliminary Examination Transcript (PE Tr.), 35.) She further testified at the preliminary examination that at the time of the robbery, she thought the person was between eighteen and twenty-five years of age. (PE Tr., 37.) Petitioner was forty-six years old at the time of trial. (Tr III, 538.)

Contrary to Petitioner's assertions, defense counsel engaged in effective cross-examination of Danielle Awad. Like the other Outback employees, Awad could not positively identify Petitioner as the robber because the robber's face was covered by a bandana. (Tr II, 176; PE Tr, 36.) Awad could only identify the robber by his race, gender, and clothing. (Tr II, 176; PE Tr, 36.) At trial, Defense counsel carefully cross-examined Awad concerning the robber's clothing. (Tr II, 196, 205-206.) Counsel impeached Awad with prior inconsistent statements to police concerning the color of the latex gloves he was wearing. Defense counsel also brought out discrepancies between Awad's description of what the robber was wearing and what Petitioner was wearing at the time of his arrest. (Tr II, 196, 205-206.) In his closing argument, Counsel relied upon on those discrepancies in a arguing that Petitioner was not the robber. (Tr IV, 591-92.) Counsel's failure to specifically cross-examine Awad concerning her previous statements concerning the robber's age did not render his performance constitutionally deficient. *Cf. Early v. United States*, No. 94-5086, 1994 WL 560969, at *1 (6th Cir. Oct.11, 1994) ("Counsel's cross-examination of officer Lewis was sufficient to put his credibility before the jury, and thus her failure to impeach him with his suppression hearing testimony did not render her performance ineffective."). Moreover, Awad's previous statements concerning her impression of the robber's age had limited evidentiary value considering that she did not see the robber's face.

- 15 -

Petitioner, therefore, fails to satisfy the first prong of the *Strickland* test.  Where counsel's performance did not fall below an objective standard of reasonableness, the Court need not reach the question of prejudice.  *See Smith v. Mitchell*, 348 F.3d 177, 199-200 (6th Cir. 2003).  Even if the Court reached the question of prejudice, Petitioner could not establish prejudice, given the overwhelming evidence that Petitioner committed the robbery.  *See Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2004).  The Outback employees described the robber as a black male, wearing a hood and a bandana over his face.  (Tr II, 141, 176, 196, 205, 216-17, 232-35, 246-47).  Officer Patterson first saw the robber while he was in the Outback.  He similarly described the robber as a black male, wearing a flannel shirt, a hat or hood over his head and a red bandana over his face.  (Tr II, 283.)  After the robber ran out of the back door of the restaurant, Officer Owen saw a man running from the back of the restaurant.  (Tr II, 310.)  He and Officer Pfau gave chase.  (Tr II, 310.)  As the officers chased the man through the Taco Bell parking lot and across Tittabawassee Road, they saw him throwing money, a bag containing money and a red bandana.  (Tr II, 289, 311, 314, 322; Tr III, 381-82.)  The officers did not lose sight of the man until he ran behind the Four Points Hotel.  (Tr II, 315; Tr III, 383.)  After a short search of the area behind the hotel, Petitioner was found hiding under a table behind an outdoor storage shed.  (Tr III, 411.)

At the time Petitioner was apprehended, he was wearing a flannel shirt, dark pants and black shoes.  (Tr II, 320-21; Tr III, 386, 415.)  During a search of Petitioner incident to his arrest, Officer Coughlin seized  a set of handcuffs, an alarm on a string, two pairs of black latex gloves, a black cap, a pager and a one-dollar bill.  (Tr III, 416-17, 448-50.)  Sergeant Hinterman also found a fully loaded .357 Magnum on the ground near the base of the table where Petitioner had been hiding.  (Tr III, 412, 424.)  Steven Jahn, a co-owner of the Outback Steakhouse, testified that the panic alarm seized from Petitioner was an Outback alarm.  (Tr III, 476, 477-78.)  Petitioner admitted

that he was chased by police officers from the Taco Bell parking lot and apprehended by police as he hid behind the Four Points Hotel.  (Tr III, 548-550.)  He also admitted that the black hat belonged to him.  (Tr III, 550-53).  In light of this evidence, Petitioner cannot demonstrate "that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt about his guilt."  *Strickland*, 466 U.S. at 695.

(B)   Petitioner further claims that counsel was ineffective when he failed to raise a timely objection to the prosecutor's failure to exercise due diligence to produce witness Elisa Potter at trial and failed to request an adverse inference instruction.[2]  Petitioner's argument is premised on the false assumption that the prosecutor has a duty to call all *res gestae* witnesses and that an objection by defense counsel to the failure to call a witness would be meritorious.  The rule upon which Petitioner relies was abolished nearly two decades ago.  For many years, Michigan statutory law imposed on the prosecution the duty to endorse on the Information and call at trial all so-called *res gestae* witnesses.  *See generally People v. Koonce*, 648 N.W.2d 153, 155-56 (Mich. 2002).  In 1986, the Legislature abolished this requirement.  1986 Pub. Act 46.  At the time of Petitioner's trial in 1999, the prosecutor was obliged only to attach to the Information a list of all known *res gestae* witnesses and to provide reasonable assistance to defense counsel, upon request, to locate and serve any such witness.  MICH. COMP. LAWS § 767.40a.  The affirmative duty to call witnesses was abolished, in favor of a defendant's constitutional right to call the witness himself under the Compulsory Process Clause.  Petitioner cites no Michigan authority supporting his assertion that a prosecutor in 1999 had any duty to call *res gestae* witnesses, or that an objection to a failure to call such witnesses would have been anything other than anachronistic nonsense.  Moreover, an adverse

---

[2]Elisa Potter was one of the five Outback employees in the office during the robbery.  The other four employees testified at trial.

inference instruction was not appropriate in this case because Potter was not under the exclusive control of the prosecution.  *See United States v. Blakemore*, 489 F.2d 193, 195 n.4 (6th Cir. 1973). Defense counsel twice commented in his closing argument concerning the prosecutor's failure to call Potter to testify for the obvious purpose of raising a question in the minds of jurors whether Potter would have given testimony unfavorable to the prosecution.  (Tr IV, 593, 605-606.)   Counsel's failure to request an unwarranted jury instruction does not constitute ineffective assistance of counsel.  *Cf. Chegwidden v. Kapture*, No. 03-1527, 2004 WL 551471, at *2 (6th Cir. March 18, 2004) (Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel), *cert. denied*, 125 S. Ct. 172 (2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (same); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (same).   Accordingly, Counsel's failure to object to the prosecutor's failure to produce Elisa Potter or to request an adverse instruction did not fall below an objective standard of reasonableness.

(C)     Petitioner further claims that counsel was ineffective for  requesting the standard intoxication instruction because it was inconsistent with his defense theory that he was not the robber.[3]  At trial, defense counsel elicited Petitioner's testimony that he was intoxicated on the

---

[3]The trial court instructed the jury on the elements of armed robbery and safe breaking and explained that they require proof of specific intent.  (Tr IV, 623.)  The trial court further instructed:

> The defendant says that he could not have specifically intended to take the money away permanently because he was intoxicated with alcohol.  You must decide whether the defendant's mind was so overcome by alcohol that he could not have formed that intent.  It may help you to think about the following questions:

> How did the defendant look at or near the time of the incident? How did he act?  What did he say?  How much alcohol had he used? And are there any other circumstances surrounding the incident that can help you decide?

(Tr IV, 624.)

night of the robbery from drinking seven beers.  (Tr III, 541, 543.)  Petitioner's sister and wife also testified that he was drinking beer that night.  (Tr III, 508, 521.)  Defense counsel further elicited testimony from the Outback employees that the robber did not appear intoxicated in order to show that Petitioner was not the robber.  (Tr II, 169; 207; 239.)  However, in the event that the jury did not believe Petitioner's version of the events, the intoxication instruction provided an alternative means for negating the intent element required for armed robbery and safe breaking.  This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight.  *Strickland*, 466 U.S. at 689.  The fact that a strategy does not work does not constitute ineffective assistance of counsel.  Petitioner, therefore, cannot overcome the presumption that counsel's conduct might be considered sound trial strategy.  *Strickland*, 466 U.S. at 689.  Even if Petitioner satisfied the first *Strickland* requirement, counsel's error had no effect on the judgment, given the strong evidence of Petitioner's guilt.

(D)     Petitioner also contends that trial counsel was ineffective when he failed to properly investigate and discover the prosecutor's case.  Specifically, Petitioner asserts that counsel failed to ensure that all of the physical evidence was tested for fingerprints and/or footprints, including the panic alarm that the robber allegedly took from Jason Weigandt.  Petitioner maintains that it would have been more convincing to show the jury that the physical evidence was negative for his finger prints than that the police failed to conduct fingerprint testing.  Petitioner further argues that the real robber's fingerprints may have been found on the evidence, thereby exculpating him.

Petitioner's argument is misguided.  First, defense counsel could not require the prosecution to conduct fingerprint analysis on every piece of physical evidence.  Even if he could, such an approach would be extremely risky if counsel believed that Petitioner's fingerprints could be found on the evidence.  A more prudent strategy would be to attack the prosecution for failing to

conduct the testing, as counsel did in this case.  In his closing argument, defense counsel repeatedly commented on the prosecution's failure to test physical evidence for fingerprints.  (Tr IV, 590, 592, 595, 602.)  Counsel argued that the jury could only assume from the lack of fingerprint evidence connecting Petitioner to the robbery that he did not commit the crime.  (Tr IV, 602.)  Counsel, therefore, used the lack of fingerprint evidence to support Petitioner's theory of the case without assuming the risk of Petitioner's fingerprints being found on the evidence.  Because counsel's strategy was eminently reasonable, Petitioner cannot satisfy the first *Strickland* requirement. Moreover, as stated above, Petitioner cannot establish prejudice in light of the overwhelming evidence that Petitioner committed the robbery.

### III.

As set forth above, appellate counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.  *McFarland*, 456 F.3d at 699**.**  Because Plaintiff's claims of ineffective assistance of trial counsel are without merit, Plaintiff cannot show that appellate counsel was ineffective for failing to raise the claims on direct appeal.  Plaintiff, therefore, cannot establish cause for his procedural default.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Nevertheless, I concluded above that Petitioner was not prejudiced as the result of appellate counsel's failure to raise his claims of ineffective assistance of trial counsel on direct appeal.  Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent.  *Schlup v. Delo*, 513 U.S.

298, 322 (1995) (citing *Murray*, 477 U.S. at 495).  Accordingly, I conclude that Petitioner's claims are procedurally defaulted.

### **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:  March 16, 2005                    /s/  Joseph G. Scoville_____
                                          United States Magistrate Judge


### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).